**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

CIVIL ACTION NO.: 1:20-cv-01088

ANDREW COLLINS,

      Plaintiff,

v.

WESTIN DIA OPERATOR, LLC (a Marriott entity), a Delaware company,

      Defendant.

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Andrew Collins, by and through his attorneys, Craig A. Silverman and Keith R. Scranton of Springer & Steinberg, P.C., respectfully alleges for his Complaint and Jury Demand as follows:

## I.      INTRODUCTION

1.      The Fourth Amendment of United States Constitution protects hotel guests from unreasonable search, seizure, and arrest.

2.      Hotel operators and their employees have a duty to protect the Fourth Amendment rights of their guests.

3.      As places of public accommodation, hotels have duties to act with reasonable care, maintain a safe and secure premises, hire and train competent employees who adhere to Fourth Amendment requirements and hotel policies regarding the sanctity of guest rooms, and to ensure that the hotel and its employees act not as lackies for overzealous police officers but

1

rather as advocates for the privacy of their guests unless an emergent situation threatens life, health, or property.

4.      Hotel operators and their employers may not assist law enforcement officers with improper or illegal activities, including accessing guest rooms and guests in their rooms without either an applicable warrant or an emergency impacting life or property.

5.      When a hotel operator ignores its duties to its guests, the hotel operator is liable to guests whose rights have been violated through the hotel operator's conduct.

6.      This case arises from such a failure.

7.      On the morning of September 20, 2018 employees of Westin DIA Operator, LLC, which operates the Denver International Airport ("DIA") Westin, were approached by law enforcement to seek access to hotel rooms on the hotel's tenth floor.

8.      The police officers did not have a warrant.

9.      The police officers did not describe an emergency that endangered human life or property.

10.     Rather, the police officers claimed some individuals in the DIA terminal building saw an unclothed man standing in a hotel room on the tenth floor looking out the window.

11.     The guest, staying for the first time at the DIA Westin, was unaware that the hotel's windows were not reflective or mirrored, and was further unaware that the opaque green windows drenched by sunlight on the DIA Terminal's south facing glass wall allowed travelers and airport staff to see directly into the DIA Westin's hotel rooms with guests illuminated as if standing in the spotlight.

12.     The hotel did not tint its windows.

13.     The hotel did not warn guests they were visible in their rooms.

14.     And when faced with two police officers demanding access to rooms on the
hotel's tenth floor to address the simple matter of a naked man in a hotel room, the hotel's
employees complied without question.

15.     The hotel's employees did not refuse to permit access without a search warrant.

16.     The hotel's employees did not attempt to call the occupied rooms on the tenth
floor and warn them that they were visible from the DIA terminal.

17.     The hotel's employees did not send an employee or manager to investigate and
correct the situation.

18.     Rather, the hotel's employees led the police to the tenth floor and began entering
rooms without guest permission in an attempt to identify which hotel room contained an
unclothed guest.

19.     After entering an empty room and getting directions from another police officer
watching the outside of the hotel from the ground, the DIA Westin's employees accompanied
law enforcement to the door of room 1017.

20.     Hotel staff did not knock or identify themselves.

21.     Hotel staff did not radio the front desk and request a call to the room to speak to
the room's guest.

22.     Rather, hotel staff stepped back and allowed overly zealous officers—officers
who were attempting to treat an unclothed person standing in the privacy of his own hotel room
as an emergency—to bang on the door and yell that the police were going to enter the room with
or without the guest's permission.

23.     Confused about the source of the disturbance, the now partially clothed hotel guest opened his hotel room door.

24.     In complete violation of the Fourth Amendment, the police barged in, placed the guest under arrest, and imprisoned him for three days.

25.     The DIA Westin's staff enabled this conduct—in direct breach of industry standards and their duty under the law.

26.     An arrest like this is damaging enough to a person who was innocently occupying his hotel room and looking out toward the Rocky Mountains on his first stay in the DIA Westin. It was compounded by the fact that the man arrested was a United Airlines pilot, a husband, a father, and a candidate with a substantial chance to serve as the next president of the Air Line Pilots Association ("ALPA"). Such an arrest harmed his career, harmed his family, and ruined his chances to serve his fellow pilots as ALPA president.

27.     Captain Collins seeks to hold Defendant accountable for its failure to properly protect and warn guests from invasion of their right to privacy while staying at the DIA Westin. By being held accountable, it is Captain Collins' hope that the DIA Westin will correct the missteps that led to his constitutional rights being violated. Captain Collins also seeks damages for the harm that the DIA Westin's employees caused him.

## II.      JURISDICTION AND VENUE

28.     This action arises under the Constitutions and laws of the United States and the State of Colorado, and is brought pursuant to Title 42 U.S.C. § 1983, Title 42 U.S.C.A. § 1985(3), Colo. Rev. Stat. § 13-21-202, *U.S.C.A. Const. Amend. 4*, Article II, section 7 of the Colorado Constitution, and the common law of the State of Colorado.

29.     Jurisdiction in this Court is conferred pursuant to Title 42 U.S.C. §§ 1331, 1343, 1983, 1985, and 1988, for actions arising under the Constitution and law of the United States. Jurisdiction is further invoked pursuant to the pendant jurisdiction of the court and Colo. Rev. Stat. § 13-21-202 and the common law of the State of Colorado, for actions arising under the Constitution and law of the State of Colorado.

30.     Venue is conferred pursuant to 28 U.S.C. § 1391(b). All the events alleged herein occurred within the State of Colorado, and the DIA Westin, the individual officers, and the Denver Police Department ("DPD") are all domiciled in Colorado.

### III.     PARTIES

31.     At all times pertinent hereto, the Plaintiff, Captain Andrew Collins, was an American citizen and pilot for United Airlines.

32.     Defendant Westin DIA Operator, LLC is a Marriott International, LLC entity, operates the DIA Westin Hotel located at 8300 Pena Boulevard, Denver, CO, and is a Delaware limited liability company with its principal place of business in Bethesda, MD. The DIA Westin is part of the Westin chain.

33.     The Westin hotel chain is now, and at all times set forth in this Complaint was, owned and operated by Marriott International, LLC.

### IV.     GENERAL ALLEGATIONS

34.     The DIA Westin is a modern hotel that opened in 2015.

35.     The DIA Westin advertises panoramic runway and mountain views from its hotel rooms and delivers on that promise.

36.     These outstanding views of the panoramic runway and/or mountains from the DIA Westin hotel rooms are only available if the curtains on the windows are open.

37.     Many high-end high-rise hotels tint their windows for the privacy and comfort of their hotel guests, especially when a hotel is located such that unseen members of the public can otherwise look into the hotel's rooms and violate the privacy of the hotel's guests.

38.     The DIA Westin is a high-end hotel.

39.     The DIA Westin is a high-rise hotel.

40.     The DIA Westin does not have tinted windows in its guest rooms.

41.     The DIA Westin's north facing rooms are approximately 100 yards from the south end of the DIA Terminal, and further than that from people going about their business inside the terminal.

42.     At mid-morning during early September, the sunlight makes any view inside the DIA Terminal impossible from the vantage point of the DIA Westin because the terminal's widows are green, opaque, and reflective.

43.     At mid-morning during mid-September, occupants inside the DIA Westin's north facing hotel rooms are visible to people inside the DIA terminal if the hotel room's shades are open.

44.     Management and employees of the DIA Westin were aware, or should have been aware, that the above described lighting and visibility conditions existed.

45.     Management and employees of the DIA Westin were aware, or should have been aware, that the above described lighting and visibility conditions were not openly obvious to hotel guests—especially those who had not previously stayed at the DIA Westin.

46.     At the time of the events giving rise to this lawsuit, the DIA Westin did not warn hotel patrons staying in north facing rooms that they were visible inside their rooms by people inside the DIA terminal building—people obscured from hotel patron's view by the DIA terminal building's green and opaque glass walls.

47.     On information and belief, the DIA Westin still does not warn hotel patrons that they may be visible from the DIA terminal.

48.     The DIA Westin was aware, or should have been aware, that unsuspecting guests may, in the privacy of their own hotel room, inadvertently expose their bodies, naked or otherwise, to people outside looking in.

49.     The DIA Westin did nothing to warn its guests of the potential for lost privacy because the hotel's windows are not tinted.

50.     On information and belief, the DIA Westin still does not warn its guests of the potential for lost privacy because the hotel's windows are not tinted.

51.     The DIA Westin and its employees knew, or should have known, that some hotel guests would mistakenly assume that their hotel room windows were tinted or mirrored and therefore fail to cover their naked bodies in the privacy of their DIA Westin hotel room.

52.     The DIA Westin and its employees knew, or should have known, that some hotel guests would, at any time of day, open their hotel room shades to look outside the window and/or let natural light into the room.

53.     The DIA Westin and its employees knew, or should have known, that some hotel guests would be unclothed when they opened their window shades.

54.     The DIA Westin and its employees knew, or should have known, that some hotel guests, when looking out their north facing hotel windows, would be unable to perceive the fact that travelers and employees in the south facing DIA terminal, over 100 yards away, would be able to see into the hotel's rooms by looking through the apparently green, opaque, and reflective wall that is visible from the DIA Westin's north facing windows.

55.     It is not a crime to be naked in your own hotel room in Denver.

56.     On September 20, 2018, oblivious to fact that other people, from a hidden vantage point over a hundred yards away, were looking in the window of his hotel room, Plaintiff was naked in Room 1017 of his hotel room at the DIA Westin.

57.     On September 18, 2018, Plaintiff, United Airlines ("UAL") Captain Andrew Collins, departed on a four-day trip piloting a United Airlines 737, with Day One ending in a layover in Boston, and a Day Two schedule in which Captain Collins was to fly himself, hundreds of passengers, and his crew from Boston to Newark to Denver to Cedar Rapids.

58.     While approaching Denver on September 19, 2018, Captain Collins and his UAL jet were diverted to Colorado Springs because of severe thunderstorms over DIA.

59.     After landing in Colorado Springs, Captain Collins travelled late on September 19, 2018 to DIA and was assigned by UAL to layover in Denver at the DIA Westin the evening of September 19, 2018, so that he could fly to Cedar Rapids in the early afternoon of September 20, 2018.

60.     After arriving at the DIA Westin, a hotel employee assigned Captain Collins Room 1017—a north facing room on the hotel's tenth floor.

61.     Captain Collins woke up mid-morning on September 20, 2018 and partially opened his curtains, allowing morning sunlight into the room while he observed DIA's iconic tent awning roof and the spectacular view of the Front Range to the northwest.

62.     From Captain Collins' vantage point, his hotel window appeared to have a tinted or mirrored composition, resembling other high-quality large city hotel windows that prevent people outside the hotel from seeing into a hotel room.

63.     From room 1017, in the late morning on September 20, 2018, people inside the terminal were not visible to Plaintiff because the terminal windows were (and are) tinted green, are opaque, and are and reflective—causing sunlight to bounce off the south facing terminal's wall without affording Plaintiff the opportunity to see people looking out the terminal's windows towards him.

64.     After waking and opening his shades, Captain Collins was going to take a shower in his room, but decided first to engage in phone conversations with fellow UAL pilots about an imminent election campaign for ALPA, in which Captain Collins was participating as a top candidate.

65.     Captain Collins, engrossed in his telephone conversations, walked around his room, animatedly gesticulating as he talked on his small hands-free blue tooth device.

66.     Captain Collins was unaware that the sunlight reflecting off of the DIA terminal's south windows and pouring into his room acted as a spotlight—effectively removing any of the privacy he assumed he had within his hotel room.

67.     At around 11:00 a.m. on September 20, 2018, Captain Collins heard loud knocking on his door and an announcement that the Denver Police were there, with Officer Karl

Coleman loudly commanding, "We are coming in with or without your permission, so open the door!"

68.     Hearing that, still unaware that individuals within the DIA terminal has seen him pacing his room while undressed, Captain Collins, wearing his reading glasses and pants, opened the door and was immediately confronted by Denver Police officers, who aggressively handcuffed and arrested him.

69.     The arresting Denver police officers were accompanied by Westin DIA Operator, LLC employees under Marriott's management and control.

70.     The Denver police had not sought or received a probable cause warrant, and thus lacked legal authority to enter into Captain Collins' hotel room or the room of any other guest.

71.     The Denver police had not sought or received a probable cause warrant to search Captain Collins' hotel room, and thus lacked legal authority to enter into Captain Collins' hotel room or the room of any other guest.

72.     The Denver police did not provide Captain Collins a Miranda advisement.

73.     The Denver police peppered Captain Collins with substantive questions as he stood handcuffed and shirtless in his hotel bedroom.

74.     When Captain Collins asked Officer Coleman why he was being arrested, Coleman said he was being arrested for lewd acts and indecent exposure, and wrongly claimed there were incriminating photographs to prove his allegations.

75.     As the morning unfolded, imprecision in the Denver police officers' truncated investigation, which involved an inaccurate telephone game of transmitting hearsay allegations between employees in the DIA terminal, resulted in the responding and overzealous Denver

Police officers who entered the DIA Westin mistakenly believing or assuming that the room's occupant was masturbating in view of the public.

76.     Upon entering Captain Collins' room, while Officer Coleman immediately arrested Captain Collins, DPD Sgt. Pfannkuch went to the hotel room window and waved her arms wildly so that an individual in the terminal could see her and attempt to confirm that DPD had entered the "correct" hotel room.

77.     Approximately eight minutes after her unlawful entry into Captain Collins' Room 1017, DPD Sgt. Pfannkuch, in the presence and hearing of DIA Westin personnel, received clarification over police communications that no masturbation or lewd acts had been observed. Nonetheless, apparently because Captain Collins had already been arrested and handcuffed by the dominant, agitated, and aggressive Officer Coleman, Sgt. Pfannkuch and DIA Westin personnel declined to intervene in the wrongful arrest despite their knowledge that the arrest was based on a false accusation.

78.     Footage from DPD Sgt. Pfannkuch's body cam video demonstrates conclusively that the view from Room 1017 of the terminal windows was opaque and reflective, thus demonstrating the impossibility that Captain Collins could have known he was visible to anybody within the DIA terminal, far away and well below his tenth-floor hotel room.

79.     Numerous witnesses told Denver Police they did not want to press charges because they did not think the occupant of Room 1017 realized he was being observed.

80.     The Denver police officers who entered Room 1017 were accompanied by employees of Westin DIA Operator, LLC who assisted with what the officers were doing.

11

81.     None of the DIA Westin employees resisted the unconstitutional violations of Andrew Collins' privacy rights.

82.     None of the DIA Westin employees demanded to see a warrant before assisting the police to violate Andrew Collins' privacy rights.

83.     None of the DIA Westin employees reached out to management or counsel to assure that they were acting in accordance with the law or Marriott policies by assisting the Denver Police officers who demanded access to private rooms without the presence of an emergency or exigent circumstances.

84.     None of the DIA Westin employees attempted to call Captain Collins or other rooms on the tenth floor to advise guests to close their shades or otherwise cover their bodies.

85.     None of the DIA Westin employees visited the tenth floor without Denver Police officers to determine whether any guests needed to be advised they were visible from the DIA terminal while unclothed.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Negligence – Failure to Warn Hotel Guest Andrew Collins)

86.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

87.     Plaintiff was a lawful registered guest of the DIA Westin while he occupied Room 1017 on the morning of September 20, 2018.

88.     DIA Westin has a duty to warn its guests of any dangers of which it is aware that are not open and obvious.

89.     Defendant Westin DIA Operator, LLC (hereinafter "DIA Westin") knew that north facing rooms in its hotel would allow occupants to be visible in their private hotel rooms by unseen persons over 100 yards away inside the DIA terminal.

90.     Defendant DIA Westin knew that its north facing rooms were designed in such a way as to permit occupants to be seen from the DIA terminal was not open and obvious to guests of the hotel.

91.     Defendant DIA Westin failed to warn Plaintiff of the danger that he may be visible from the DIA terminal while in Room 1017.

92.     Defendant DIA Westin failed to warn Plaintiff that he may be exposing himself to persons inside the DIA terminal if disrobed in Room 1017 with the blinds at all open.

93.     As such, Defendant DIA Westin breached its duty to Plaintiff to warn of a danger associated with his use of Room 1017 that was not obvious.

94.     Defendant DIA Westin should have tinted its hotel windows and thus eliminated the danger of its hotel occupants inadvertently exposing disrobed bodies to persons inside the DIA terminal.

95.     Absent tinting its hotel windows, Defendant DIA Westin had a duty to provide warnings to Plaintiff and any other guests occupying a north facing room regarding the risk that they were visible to people in the DIA terminal if their shades were not closed.

96.     As a result of Defendant DIA Westin's negligence, Plaintiff incurred damages and losses.

## SECOND CAUSE OF ACTION

(Violation of 42 U.S.C.S. § 1985 (3) Conspiracy to Interfere with Civil Rights)

### CONSTITUTIONAL RIGHTS TO PRIVACY

Violation of *Fourth Amendment*; and Art. II, section 7 of Colorado Constitution

97.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

98.     A warrantless search is prima facie unconstitutional unless it is justified by an established exception to the warrant requirement of the Fourth Amendment and the state constitution. U.S.C.A Const. Amend. 4, Article II, section 7 of the Colorado Constitution.

99.     To justify a warrantless entry under the hot pursuit and destruction of evidence exigency exceptions, the government must show both probable cause and the existence of the exigency. U.S.C.A Const. Amend. 4, Article II, section 7 of the Colorado Constitution.

100.     In judging a constitutional violation of privacy, a court must examine the totality of the circumstances as they would have appeared to a "prudent and trained police officer" at the time the decision to conduct the warrantless search is made. *Smith,* 40 P.3d at 1290; *People v. Malczewski,* 744 P.2d 62, 66 (Colo.1987); *People v. Hebert*, 46 P.3d 473, at 479-80 (Colo. 2002).

101.     A guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures just as if he was in his own home.

102.     Under the Fourth Amendment, a warrantless search of a person's home is presumptively unreasonable.

103.    An exception to the warrant requirement exists where police have obtained

voluntary consent to the search, but no such voluntary consent and waiver of Plaintiff's

constitutional rights to privacy occurred here.

104.    Consent to enter Room 1017 or search Room 1017 was neither sought nor

obtained.

105.    The mere fact that Plaintiff opened his door when threated with an overzealous

officer's threat to "come in" to his room with or without his permission does not equate to

consent to enter his room.

106.    If facts would have been fairly evaluated, there was no probable cause to arrest

because mere reports of observable nudity did not mean Plaintiff had committed a crime.

107.    Had Defendant DIA Westin and its personnel followed their duty to protect

Plaintiff's Fourth Amendment rights, Denver Police would have been required to submit

sufficient information to attain a warrant, which would have protected Plaintiff's constitutional

rights and likely resulted in no issuance of a warrant, and no arrest.

108.    Defendant DIA Westin and its personnel, and members of the Denver Police

Department acted cooperatively to violate Plaintiff's constitutional right to privacy in his Room

1017 at the DIA Westin on September 20, 2018.

109.    Defendant DIA Westin and its personnel allowed Denver Police officers to violate

Plaintiff's constitutional rights.

110.    Defendant DIA Westin and its personnel aided Denver Police officers as

Plaintiff's constitutional rights were violated.

111.    42 U.S.C.A. § 1985 (3) prohibits a conspiracy to interfere with civil rights by means of any two or more persons who have conspired for the purpose of depriving, either directly or indirectly, any person of the equal protection of the laws, or of equal privileges and immunities under the laws; if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

112.    As a result of the foregoing conduct, Plaintiff experienced damages and losses.

### THIRD CAUSE OF ACTION
(Negligence – Violation of Innkeepers' Duty)

113.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

114.    Plaintiff was a lawful, paid in full, registered guest of the DIA Westin who was promised he would have his Room 1017 until the time of mandatory check-out.

115.    Defendant DIA Westin had an innkeeper's duty to protect its guest, Plaintiff, against an unreasonable risk of being harmed.

116.    Defendant DIA Westin had an innkeeper's duty to protect its guest, Plaintiff, against an unreasonable risk of being harassed.

117.    Agents of the Defendant DIA Westin assisted Denver police to invade the privacy of Plaintiff's hotel room while he was its guest, subjecting Plaintiff to an invasion of his privacy and physical assault and battery by the illegally entering police.

118.     Based on the special relationship that exists between an innkeeper such as DIA

Westin, and its guest, Plaintiff Andrew Collins, the Defendant DIA Westin had a duty to exercise

reasonable care under the circumstances.

119.     Defendant DIA Westin did not exercise reasonable care under the circumstances

presented during the invasion of Room 1017 occupied by its registered guest, the Plaintiff.

120.     Aware of the configuration of its north facing rooms, Defendant DIA Westin,

through its employees, failed to simply call Room 1017 (or any other room on the tenth floor)

and alert Plaintiff, its customer, that unseen people alleged they could see him unclothed, thus

warning him accordingly so that he could either dress or close his window shades.

121.     As a result of the foregoing conduct, Plaintiff experienced damages and losses.

### FOURTH CAUSE OF ACTION
(Negligent Hiring and Training)

122.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set

forth herein.

123.     Defendant DIA Westin employees assisted Denver police officers to invade the

privacy and constitutional rights of one of its guests.

124.     Defendant DIA Westin had a duty to properly hire employees who would respect

and safeguard the privacy and constitutional rights of one of its guests.

125.     Defendant DIA Westin had a duty to properly train employees to respect and

safeguard the privacy and constitutional rights of one of its guests.

126.     Upon information and belief, and as evidenced by their actions, Defendant DIA

Westin's employees did not respect and safeguard the privacy and constitutional rights of one of

its guests.

127.     Upon information and belief, and as evidenced by their actions, Defendant DIA Westin's employees did not receive adequate training to ensure that they respected and safeguarded the privacy and constitutional rights of their guests.

128.     Upon information and belief, and as evidenced by their actions, Defendant DIA Westin either failed to have policies and procedures in place governing employees' responses to police attempts to access guest rooms, or failed to ensure that DIA Westin's employees followed such policies and procedures if they existed.

129.     Plaintiff's freedom, right to privacy, and constitutional rights were violated as a result of Defendant DIA Westin failing to hire and train its staff to respect the privacy and constitutional rights of its hotel guests.

130.     As a result of the foregoing conduct, Plaintiff experienced damages and losses.

## FIFTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress -- Outrageous Conduct)

131.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

132.     Defendant engaged in extreme and outrageous conduct in effectuating the invasion of Plaintiff's hotel room and allowing the arrest and jailing of Plaintiff, its hotel guest.

133.     A reasonable member of the community would regard Defendant's conduct as atrocious, going beyond all possible bounds of decency, and utterly intolerable in a civilized community.

134.     A reasonable member of the community with knowledge of the foregoing facts would resent Defendant for the conduct described in this complaint.

18

135.    Defendant engaged in this conduct recklessly or with the intent of causing the plaintiff severe emotional distress.

136.    Plaintiff incurred severe emotional distress that was caused by the defendant's extreme and outrageous conduct.

137.    As a result of the foregoing conduct, Plaintiff experienced damages and losses.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant, and award him all relief allowed by law, including but not limited to the following:

(a)    Appropriate relief at law and equity;

(b)    Declaratory relief and other appropriate equitable relief, including an order from the court to tint or mirror the hotel's north facing windows, or to provide warnings to guests staying in north facing rooms that they are visible from the DIA terminal;

(c)    Economic losses on all claims allowed by law;

(d)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)    Punitive damages on all claims allowed by federal law and in an amount to be determined at trial;

(f)    Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)    Pre-judgment interest and post-judgment interest at the highest lawful rate;

(h)    Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 17ᵗʰ day of April 2020.

**SPRINGER AND STEINBERG, P.C.**

By: *s/ Craig A. Silverman*
Craig A. Silverman, #11224

*s/ Keith R. Scranton*
Keith R. Scranton, #42484

SPRINGER & STEINBERG, P.C.
1600 Broadway, Suite 1200
Denver, Colorado 80202
Telephone: 303.861.2800
Facsimile:  303.832.7116
csilverman@springersteinberg.com
kscranton@springersteinberg.com
*Counsel for Plaintiff*